MARK WINDSOR, Cal. Bar No. 190589
1 South Fair Oaks Avenue, Suite 401
Pasadena, CA 91105
Tel: (626) 792-6700
Fax: (626) 956-8900
Email: mark@windsorlaw.us

Attorney for Defendant Juan Carlos Garcia

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,          )   Case No.:  17CR273-ODW
                                   )
                   Plaintiff,      )
                                   )   EX PARTE APPLICATION TO PERMIT
          v.                       )   LIVE VIDEO TESTIMONY, OR IN THE
                                   )   ALTERNATIVE TO CONTINUE
JUAN CARLOS GARCIA                 )   TRIAL; DECLARATION OF JAMES L.
                                   )   BAKER; DECLARATION OF MARK
                   Defendant.      )   WINDSOR; PROPOSED ORDER
                                   )
                                   )
_____  )

     Defendant, Juan Carlos Garcia, through counsel, hereby applies to this

Honorable Court for an order that the defense be permitted to offer the testimony

of its expert witness via live video feed at trial, pursuant to Fed. R. Crim. P.2 and

57(b), rather than via Rule 15(a). This application is based on the attached

memorandum of points and authorities, the attached declarations, all files and

records in this case, and such further information as may be provided to the Court

regarding the application.

Dated: December 1, 2017              Respectfully Submitted
                               By:   _/s/_____
                                     MARK WINDSOR

1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Mr. Garcia wishes to proffer the testimony of Bureau of Prisons Expert James L. Baker. As set forth in the attached declaration of Mr. Baker, this witness is at the very heart of Mr. Garcia's defense.

Mr. Baker has been working with Mr. Garcia's defense team since October 16, 2017, and has a thorough knowledge of the key evidence in this case. Unfortunately, due to the issues addressed in Mr. Baker's Declaration re Health Issues, filed under seal concurrently with this Ex Parte Application, Mr. Baker is not able to appear in Los Angeles on the currently set trial date without endangering his health, unreasonable expense, or both. Given the proximity to the current trial date, a Rule 15(a) deposition is not practical. Video transmitted testimony is allowed under the federal rules. Cf. Fed. R. of Civ. Proc. 43(a) ("For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location.") Live video testimony, via the use of professional video-conferencing services, will preserve the characteristics of in-court testimony of the expert witness, including: that the witness (1) will be sworn, (2) subject to full cross-examination by the government (with the use of any desired exhibits in real-time via dropbox or prior email), and (3) testify in full view of the jury, trial court, and government counsel. This procedure has been used in the past in the Central District of California, including in *U.S. v. Luman*, CR 09-1256-JFW.

Courts have recognized that the live video feed option is the functional equivalent to face-to-face testimony, superior to Rule 15(a) depositions. *F.T.C. v. Swedish Match North America*, 197 F.R.D. 1 (D.D.C. 2000)(no practical

difference between live testimony and contemporaneous video transmission, no adverse impact on ability to assess demeanor and credibility); *U.S. v. Gigante*, 166 F.3d 75 (2d Cir. 1999) (Testimony via two-way circuit television preserved salutary effects of in-court testimony and afforded greater protection of defendant's rights than would have been provided by pretrial deposition). The government has advised that it will oppose the use of live video feed testimony.

Because live video testimony is superior to Rule 15(a) depositions taken in advance of trial, Mr. Garcia respectfully requests leave of the Court to present the testimony of these witnesses via live video feed at trial. The government opposes the use of live video feed in place of Rule 15 depositions – at least absent a proffer of the witness testimony (such as that provided, in camera, to the Court), which the defense has, in turn, declined to provide at this juncture (and has, instead, provided the Court).

## II.

## ARGUMENT

**A. Mr. Garia's Fifth and Sixth Amendment Rights Militate In Favor of Allowing His Presentation of Defense Witness Testimony Via Live Video**

It is a basic tenet of due process that a defendant must be allowed to present favorable evidence. *Chambers v. Mississippi*, 410 U.S. 284, 294 (1971); *Washington v. Texas*, 388 U.S. 14, 19 (1967); *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988). It can constitute a violation of due process if the missing witness' testimony would have been relevant, material and favorable to the defense. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 872 (1982).

As a threshold matter, the preference for "face-to-face" testimony comes

from the *defendant*'s Sixth Amendment right to confrontation – a right that belongs to Mr. Garcia, not the government here. *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988) (The Confrontation Clause "guarantees *the defendant* a face-to-face meeting with witnesses appearing before the trier of fact.") (emphasis added). In other words, Mr. Garcia's Fifth and Sixth Amendment rights to present a defense, protect a privileged defense theory, be present in real-time when the witnesses present testimony, and be brought to speedy trial outweigh any non-constitutional interest the government could have in face-to-face testimony.

Further, even in the face of the *defendant*'s right to confrontation, the right to a physical face-to-face meeting is not absolute. *Maryland v. Craig*, 497 U.S. 836, 848 (1990). "[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial...where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Craig*, 497 U.S. at 850. Thus, even when the *government* wishes to use two-way video conference testimony at trial, that does not violate a defendant's right to confrontation where (1) the court finds that the denial of physical face-to-face confrontation at trial is necessary to further an important public policy, and (2) the reliability of the testimony is otherwise assured.  *See Craig*, 497 U.S. at 850, 855 (use of a closed-circuit television procedure that permits a child witness in a child abuse case to testify at trial *against a defendant* in the absence of face-to-face confrontation is permissible if the trial court makes an adequate "case-specific" finding of "necessity"); *see also U.S. v. Quintero*, 21 F.3d 885 (9th Cir. 1994) (testimony of minor witness who was not victim via closed circuit television did not violate defendant's rights); *People v. Lujan*, 211 Cal. App. 4th 1499, 2012 WL 6573078 (2d Dist. 2012) (same); Cf., *United States v. Medjuck*, 156 F.3d 916, 920 (9th Cir.1998) (upholding admission of videotaped testimony from three Canadian

witnesses where the defendant "was able to participate in the depositions via a live video").

In cases other than the scores of federal and state cases upholding the use of live minor witness testimony via closed-circuit television, courts have also upheld the use of live testimony transmitted from remote locations in the face of defendants' confrontation challenges, and have found this technology to be superior, or at least akin, to the use of depositions approved by the Rule.

In *United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999), for example, the Second Circuit upheld the trial's court's decision to permit a key government witness, who was too ill to travel, to testify via two-way, closed-circuit television, based on his "inherent power" under Fed. R. Crim. P. 2 and 57(b) to structure a criminal trial in a just manner. Id. at 80. During the testimony, the witness was visible on video screens in the courtroom to the jury, defense counsel, the court, and the defendant, and could see and hear defense counsel and other courtroom participants on a video screen at his remote location. Id. On appeal, the court held that:

> The salutary effects of face-to-face confrontation include 1) the giving of testimony under oath; 2) the opportunity for cross-examination; 3) the ability of the fact-finder to observe demeanor evidence; and 4) the reduced risk that a witness will wrongfully implicate an innocent defendant when testifying in his presence.

Id. at 81. In the Second Circuit's view, the closed-circuit television procedure "preserved *all* of these characteristics of in-court testimony;" thus, the defendant forfeited none of the constitutional protections of confrontation. *Id.* (emphasis added).

The court went on to compare the close-circuit television procedure used with that of the Rule 15 deposition, finding the former superior:

A more profitable comparison can be made to the Rule 15 deposition...Under the circumstances of this case, Judge Weinstein could have admitted Savino's testimony pursuant to Rule 15 without offending the confrontation clause...We agree that the closed-circuit presentation of Savino's testimony *afforded greater* protection of Gigante's confontation rights than would have been provided by a Rule 15 deposition. It forced Savino to testify before the jury, and allowed them to judge his credibility through his demeanor and comportment...Closed-circuit testimony also allowed Gigante's attorney to weight the impact of Savino's direct testimony on the jury as he crafted cross-examination.

*Id.* at 81. Thus, the court held:

Because this procedure may provide *at least as great* protection of confrontation rights as Rule 15, we decline to adopt a stricter standard for its use than the standard articulated by Rule 15. Upon a finding of exceptional circumstances, such as were found in this case, a trial may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice.

*Id.* (emphasis added).

Likewise, in <u>United States v. Mostafa</u>, 14 F. Supp. 3d 515 (S.D. N.Y. 2014), the court granted the government's motion, pursuant to Federal Rules of Criminal Procedure 2 and 15, for an order allowing Badat to testify by live closed-circuit television in the defendant's trial on terrorism charges. In so holding, the court reasoned, "In some regards, CCTV provides *more* of the characteristics that the Supreme Court has deemed significant to the Confrontation Clause. For instance, the demeanor of a witness is apparent for the trier of fact to see live." <u>Id.</u> at 520 (emphasis added).

Finally, in <u>State v. Sewell</u>, 595 N.W.2d 207 (Minn. Ct. App. 1999), <u>review denied</u>, (Aug. 25, 1999), the court held that the presentation of prosecution witness' testimony through use of interactive television was akin to use of videotaped deposition testimony, and thus authorized under rules of criminal

procedure, and did not violate defendant's confrontation rights where defense counsel had the unfettered opportunity to cross-examine witnesses. The court reasoned, "ITV is not a deposition, but it is a 'sound-and-visual' means of presenting testimony and is *the functional equivalent* of a videotaped deposition within the authority of rule 21."Id. at 212.   The court then addressed appellant's argument that the transmission of the witness's testimony through ITV was distorted in both sound and image, and that the distortions precluded effective cross-examination and impaired the jury's ability to consider Hurt's demeanor in assessing his credibility. The court disagreed:

> Hurt's image on the screen in the courtroom was sufficiently clear to allow the jury to view him continuously and in reasonably precise detail throughout his testimony. The audio and the visual were synchronized and there was no sound distortion. *There was occasional transitory and insignificant static-type interference with the video image. There was also a very slight time delay between questions and answers but this did not appear problematic.* Appellant objected only once during Hurt's testimony and, presumably because of the time delay, Hurt answered before the court ruled. The court sustained the objection and instructed the jury to disregard Hurt's answer. This situation occurs even with live, in-court testimony; it cannot be said to be unique to ITV technology. There was no technical deficiency or distortion in the transmission of Hurt's testimony that could reasonably be viewed as having impaired the cross-examination of Hurt or the jury's observation of his demeanor. Thus, we reject appellant's assertion that the quality of the ITV transmission deprived him of his right of confrontation.

*Id.* at 524 (emphasis added).

In addition, at least one court has specifically approved the use of live video testimony in place of live testimony in court, deeming it to be the functional equivalent. In F.T.C. v. Swedish Match North America, Inc., 197 F.R.D. 1 (D.D.C. 2000), the court held that witness who resided in Oklahoma would be permitted to testify for plaintiff via live video feed at a hearing held in the District

of Colombia because there was "no material difference between the live testimony and the live video testimony." Id.at *2. The court reasoned that, "[b]oth the Federal Rule of Civil Procedure 43(a) and recent cases from the Ninth Circuit support contemporaneous transmission of testimony provided a good cause is shown and appropriate safeguards used." Id. (citing Beltran-Tirado v. INS, 213 F.3d 1179 (9th Cir.2000) (permitting the use of telephonic testimony where witness lived in Missouri while the hearing was held in San Diego and witness testimony was subject to cross examination); Alderman v. SEC, 104 F.3d 285, 288 n. 4 (9th Cir. 1997)(rejecting plaintiff's suggestion that credibility findings were undermined because witness testified at the hearing by telephone) (citing Official Airline Guides, Inc. v. Churchfield Publications, Inc., 756 F.Supp. 1393 (D.Or. 1990)) (relying on telephonic testimony), aff'd, 6 F.3d 1385 (9th Cir. 1993)). More importantly, the court reasoned:

> the use of live video transmission will not prejudice the defendants because adequate safeguards exist to protect the procedure. In assessing the safeguards of such contemporaneous transmissions, the courts focus on whether the testimony was made in open court, under oath, and whether the opportunity for cross examination was available. In the present case, Mr. Cross will testify through live video in open court, under oath, and defendants will have the opportunity to cross-examine the witness. The court, therefore, will have ample opportunity to assess the credibility of Mr. Cross.

**B.    In the Alternative, The Court Should Continue the Trial.**

If the Court will not grant the request for an order permitting testimony by live video feed, this Court should continue the currently set trial date to a date when Mr. Baker or another equally qualified and knowledgeable expert is able to appear in person. It is essential to Mr. Garica's defense that he be allowed to present expert testimony in this case, and if Mr. Baker cannot participate in the trial by video feed, then we respectfully request sufficient time for Mr. Baker's

condition to improve, or for another expert to come onto the case to assist at trial as a Bureau of Prisons expert.

## II.

## CONCLUSION

Mr. Garcia respectfully requests that the Court grant this application. A Proposed Order is submitted herewith.


Dated: December 1, 2017          Respectfully submitted,

                                                    /s/

                                        MARK WINDSOR

                                        Attorney for Defendant

                                        Juan Carlos Garcia

## DECLARATION OF JAMES L. BAKER

I, JAMES L. BAKER, do hereby declare and say:

1.      I was appointed on October 16, 2017 as a Bureau of Prisons expert to assist the defense for JUAN CARLOS GARCIA in *United States of America v. Garcia, et al.* 17CR273-ODW.

2.      In connection with my appointment I have reviewed numerous documents and other materials relevant to the charges in this case that were obtained through discovery. These materials include three digital video tapes of the incident that is the subject of the charges in this case. I was asked to give my opinion relating to the incident, including the question of whether the behavior of the staff members were consistent with BOP policies and practices.

3.      In reviewing the videos I was struck by the staff member's (SIS Tech) demeanor during the encounter. It is my opinion, based on my knowledge of BOP procedures and practices and my experience as a guard and expert witness, that the staff member acted in such a manner as to cause the confrontation. I am aware from discovery that the SIS tech was talking to the inmate concerning an incident report he had written on the inmate. This is in direct conflict with Program Statement 5270.9, Inmate discipline and special housing units, which it describes the procedure for issuance of an incident report. Specifically, the SIS Tech, as the reporting party, had no cause or responsibility to discuss the incident report he had written. The policy states that the reporting party will turn the incident report over to a Lieutenant who will conduct an

investigation to include issuing the inmate a copy of the incident report. It is clearly implied that the reporting party will have no further involvement in the incident report once it is written. If the incident had not yet been written then there is no reason for the staff member to inform the inmate that one was going to be written. Doing this is a clear indication that the staff member wished to cause a confrontation because there was no other reason, official or otherwise, for him to do so. There is nothing the inmate could say or do to stop the report from being written, so it doesn't make sense.

      4.    The videos revealed that the incident took place in the unit day room, in full view of the other inmates present in the unit at the time. This is an unsound correctional practice. Every unit in the Bureau of Prisons has facilities (Offices) available for interviewing an inmate. To confront the inmate in the open area of the unit in the presence of other inmates puts the inmate on the spot. I observed at one point in the video the inmate turned to walk away and witnessed the staff member say something else to the inmate at which time he turned and again faced the staff member. It also appeared to me that the staff member raised his closed fists before the inmate. Soon after that, the staff member appears to quickly lunge at the inmate. This gives me further reason to believe that the staff member's intention was nothing more than to elicit a negative response from the inmate rather than performing any official or appropriate duties.

5.     It is clear from the video that the staff member failed to use good judgment in this incident. As a SIS Tech the staff member has the responsibility to be aware that talking to an inmate in such a setting would place the inmate in a no-win situation, for him to back down he would be viewed as a "punk," or weak inmate. Being viewed as a weak inmate would subject him to having his personal property stolen, being assaulted or possibly murdered by other inmates who observed the confrontation or heard of it.

6.     My expert qualifications are set forth in the attached resume. Specifically with respect to my expert opinion on this confrontation, I was assigned to the Investigative office in three Bureau of Prisons facilities. I was the Special Investigation Supervisor at USP Lompoc, I was the Special Investigative Agent at the USMCFP Springfield Mo and at USP Marion. As such I had the responsibility to supervise the staff assigned to the investigative office. This included the SIS techs. I can say without question had a staff member assigned to my office conducted himself in the manner this SIS tech did I would have removed him from that assignment at once.

7.     I was assigned as the Discipline Hearing Officer for five years at USP Lompoc, as such I had operational responsibility for the Inmate Discipline Program at the institution. I believe that the incident reports issued from the incident, specifically, code 101 Assault charges have been over-charged. This incident in my opinion, should have been charged as code 224 assault. Program Statement 5270.9 Inmate Discipline and Special Housing units clearly states that to support a code 101 Assault charge serious

injuries or attempted serious injuries must have been committed or attempted. The

evidence in this incident does not support the Greatest Severity-level charge.

     I declare under the penalty of perjury that the foregoing is true and correct.

Executed December 1, 2017 at Mitchell, Indiana.

Respectfully submitted,

JAMES L. BAKER

# DECLARATION OF MARK WINDSOR

I, Mark Windsor, hereby state and declare as follows:

1.     I am counsel of record for Juan Garcia in *United States v. Garcia, et al.*, 17CR273-ODW.

2.     This declaration is filed in support of the attached Ex Parte Application for Order Permitting the Testimony of Expert Witness Via Live Video Feed at Trial.

3.     On July 21, 2017 this Court continued the trial in this matter to December 5, 2017 at 9 a.m. at the request of the parties.

4.     On October 2, 2017 I filed a pretrial motion to compel production of discovery in this case [Doc. 29] and noticed it for a hearing on October 30, 2017 in compliance with this Court's procedures.

5.     On October 12, 2017 I was advised via e-mail by the Deputy Clerk that this Court would not be available for trial on the scheduled date of December 5, 2017, and that the Court was requesting a stipulation to continue the trial to late January of 2018.

6.     At that time, and continuing to the present, my client was housed in a segregated unit where he was locked down at least 23 hours a day and isolated from other inmates. These were and are difficult conditions for Mr. Garcia, and he understandably does not want to suffer them indefinitely. At the time the Deputy Clerk advised me of the Court's request to stipulate to a continuance of the December 5 trial date, Mr. Garcia had been housed in the segregated unit for over seven months. When I asked about continuing the trial, he informed me that he did not want to continue the trial to a date after the December 5 date, which he believed would prolong his segregation. In light of this, I enquired of government counsel whether they would consent to transfer of the case to another judge in order to accommodate the Court's request as well as my clients'.

6.     When I did not receive a response from this inquiry, I lodged a Notice of Related Case with the Court, which referenced Mr. Garcia's other ongoing federal case before the Honorable Christina A. Snyder, *U.S. v. Garcia*, 13CR824-CAS, to at least provide this Court with the possibility of transferring the case to Judge Snyder. The government filed an Opposition to this Notice on November 13, 2017.

7.     On October 19, 2017 I was informed by the Deputy Clerk via e-mail that the motion hearing date of October 30, 2017 had been continued to November 27, 2017. I was further informed that this date could change, and the case could be transferred. At this point, because pretrial discovery issues were now delayed to a week before the trial date and the case had not been transferred, I believed the trial was very likely not going forward on December 5, 2017 and I informed my investigator and expert witness of this opinion. Nonetheless, my defense team and I continued to work diligently to prepare the case for trial.

8.     On November 15, 2017 I was informed by the Courtroom Deputy that the Court needed to continue the December 5 trial date to a date in late February of 2018. I informed the Courtroom Deputy that my client could not stipulate to a continuance, and a status conference was set for November 29, 2017. This date was later vacated and the status conference was set at the same time as the discovery motion on November 27, 2017.

9.     On November 27, 2017, the trial date was set for December 12, 2017. Later that day, the trial date was changed back to December 5, 2017. I immediately contacted my expert witness, Mr. Baker, about this development. Mr. Baker informed me that he may not be able to make it to Los Angeles due to health issues, and told me he would consult his doctor about flying.

10.     Upon hearing this news, I began researching and contacting alternative experts. I did this because testimony from a BOP expert on the issues of inmate code (what would have happened to Mr. Garcia if he had not responded to the provocation) and scope of official duties are both essential to the defense of this case.

2

1   I was able to identify three other individuals with appropriate qualifications, and

2   spoke with each of them extensively. One was unable to obtain permission to assist

3   me (he is currently employed by a government corrections department), and the other

4   two experts indicated they could not be ready to provide testimony in the time

5   available between now and the trial. In sum, I ultimately could not find someone to

6   substitute for Mr. Baker.

7         11.    Mr. Baker's testimony is a necessary component of our planned defense

8   at trial. Because the trial date is set for December 5, 2017 and Mr. Baker cannot fly

9   out to Los Angeles for a trial on that date, I am requesting the Court authorize live

10  feed video testimony from Mr. Baker from near his home in Indiana. This will enable

11  him to testify and allow cross-examination by government counsel while still

12  allowing Mr. Garcia to present his defense to the charges against him and meeting

13  this Court's scheduling preferences.

14  11.    My investigator, Joel Wyenn, has contacted the Federal Defenders Office in

15  Indianapolis, Indiana, which is a 1.5-hour drive from Mr. Baker's place of business,

16  and has been informed that facilities are available at the Federal District Court in

17  Indianapolis for live feed video testimony. Mr. Wyenn has told me further that the

18  Clerk's Office in Indianapolis has a conference room set up for this purpose.

19  Therefore, should this Court authorize this method of testimony by Mr. Baker, the

20  technology and logistics are available at the Indiana end of the feed.

21          I declare under penalty of perjury that the foregoing is true and correct

22  to the best of my knowledge.

23

24      Executed this 1st day of December, 2017, at Pasadena, California.

25

26                      _____/s/_____

27                      MARK WINDSOR

28